# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JESSICA KOHL and MATTHEW KOHL,**
**individually, and on behalf of a class of**
**persons similarly situated,**

    **Case No.: 6:20-cv-01683-Orl-41 GJK**

**Plaintiffs,**

    **CLASS REPRESENTATION**

**vs.**

    **INJUNCTIVE RELIEF SOUGHT**

**PLURIS WEDGEFIELD, LLC, PLURIS**
**HOLDINGS, LLC, and PLURIS**
**WEDGEFIELD, INC.,**

**Defendants.**

_____

## FIRST AMENDED CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiffs Jessica Kohl and Matthew Kohl (collectively "Representative Plaintiffs") bring this Complaint on behalf of themselves, and on behalf of a Class of other people similarly situated. Plaintiffs and the Plaintiff Class (collectively "Plaintiffs") sue Defendants Pluris Wedgefield, LLC, Pluris Holdings, LLC, and Pluris Wedgefield, Inc. (collectively "Defendants" or "Pluris"), and allege as follows:

### STATEMENT OF THE CASE

1.    This is a class action on behalf of individual Plaintiffs and Class Representatives Jessica Kohl and Matthew Kohl and a class of people similarly situated who have been damaged and continue to be damaged due to Defendants' negligent, intentional, willful and wanton release of toxic chemicals into the potable water supply of the Wedgefield residential housing community.

2.    Representative Plaintiffs and Members of the proposed Class are owners and

occupants of property with water service provided by Pluris Wedgefield, LLC and/or its predecessor entities. The water supplied to Representative Plaintiffs and Members of the proposed Class by Pluris has been and continues to be contaminated with excessive disinfectant byproducts due to Defendants' flawed treatment of the Wedgefield drinking water.

3.    The water supplied to Representative Plaintiffs and Members of the proposed Class by Pluris is not in conformity with the regulations governing community water systems, particularly with respect to the following disinfection byproducts: trihalomethanes ("TTHM"), total haloacetic acids ("HAA5") and chlorite. Exposure to excessive amounts of TTHM, HAA5 and/or chlorite can cause significant health effects including an increased risk for liver, kidney and central nervous system problems, as well as an increased risk of cancer.

4.    As discussed more fully below, TTHM, HAA5 and chlorite are chemical disinfection byproducts that can result from treating drinking water with chlorine or chlorine dioxide. The Environmental Protection Agency ("EPA") sets forth a maximum contaminant level ("MCL") for each of the aforementioned chemicals. The MCL is the maximum permissible concentration of a contaminant that can be delivered to any user of a public water system. Pluris has repeatedly served Representative Plaintiffs and Members of the proposed Class with drinking water that exceeds the EPA mandated MCLs for TTHM, HAA5 and chlorite.

5.    Representative Plaintiffs and Members of the proposed Class have suffered damages as a result of Defendants' discharge of toxic chemicals into the Wedgefield potable water supply. Plaintiffs also seek equitable and injunctive relief to compel Defendants to cease and desist the spread of toxic chemicals into and through the Wedgefield potable water supply.

## JURISIDICTION

6.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)

because (i) it is a class action with a class of over 100 members, (ii) at least one member of the proposed class is a citizen of a different state than that of any defendant, and (iii) the amount in controversy exceeds $5,000,000.00.[1]

7.      This Court has jurisdiction over Defendants because each Defendant is engaged in substantial and non-isolated activity within the state of Florida, and each Defendant (i) operates a business and/or business venture within the State of Florida; (ii) committed a tortious act within the State of Florida; (iii) caused injury to persons and property within the state of Florida; and (iv) breached a contract by failing to perform acts required to be performed in the state of Florida.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (c) because a substantial part of the events giving rise to Representative Plaintiffs and Members of the proposed Class' claims occurred in this District.  Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact substantial business in this District.

### PARTIES

9.      Representative Plaintiffs Jessica Kohl and Matthew Kohl are residents of Orange County, Florida, and reside at and own property located at 2705 Abalone Blvd. Orlando, FL 32833. Representative Plaintiffs Jessica Kohl and Matthew Kohl are customers of Pluris and have used potable water supplied by Pluris Wedgefield, LLC and/or its predecessor entities for drinking, cooking, and other domestic purposes since January 2012.  Representative Plaintiffs' water supply has been and continues to be contaminated with disinfectant byproducts released into the water by the Pluris Wedgefield water treatment facility.

10.     Defendant Pluris Wedgefield, LLC is a Florida limited liability company with its

---

[1] This case was originally filed in the Circuit Court for the Ninth Judicial Circuit in and for Orange County, Florida. Defendants removed this action to federal court pursuant to the Class Action Fairness Act of 2005 ("CAFA") on September 14, 2020.  *See* Doc. 1.

principal place of business located at 5950 Berkshire Lane, Suite 800, Dallas, Texas 75225. Pluris

Wedgefield, LLC is the holder of Certificate Nos. 404-W and 341-S, which authorize Pluris

Wedgefield, LLC to provide Class A water and wastewater utility services to the Wedgefield

residential housing community. At all relevant times, Pluris Wedgefield, LLC individually and/or

through its predecessor entities has conducted business in Orange County, Florida.

11.     Defendant Pluris Holdings, LLC is an inactive foreign limited liability company

with its principal place of business located at 5950 Berkshire Lane, Suite 800, Dallas, Texas 75225;

and its regional office located at 1102 S. Florida Ave., Lakeland, FL 33803. The Florida

Department of State, Division of Corporations, inactivated Pluris Holdings, LLC's corporate status

for failure to file its annual report on September 25, 2015. Pluris Holdings, LLC was incorporated

under the laws of Nevada in December 23, 2009 and converted into a Dallas limited liability

company of the same name on December 31, 2013. At all relevant times, Pluris Holdings, LLC

was conducting business in Orange County, Florida.

12.     Defendant Pluris Holdings, LLC is the parent company, managing member and

sole shareholder of Pluris Wedgefield, LLC. Pluris Holdings, LLC provides all management,

accounting, tax, construction, financial services and administrative services to Pluris Wedgefield,

LLC for a cost of approximately $500,000.00 per year. Pluris Holdings, LLC established,

implemented, monitored and ratified all actions of Pluris Wedgefield, LLC and was an active

participant in the policies, procedures and wrongful conduct that caused Representative Plaintiff's

and Members of the proposed Class to receive contaminated potable water. At all times material

hereto, Defendant Pluris Holdings, LLC operated complete dominion over its wholly owned

subsidiary Pluris Wedgefield, LLC so that Pluris Wedgefield, LLC had no corporate identity of its

own.  Pluris Holdings, LLC further used its management agreement to wrongly extract  financial resources from Pluris Wedgefield, LLC to the detriment of Plaintiffs and the putative class.

13.    Defendant Pluris Wedgefield, LLC is the surviving entity of several mergers and conversions among affiliate companies.  Pluris Wedgefield, LLC was formed in the state of Florida on April 21, 2009.  On or about May 26, 2009, Pluris Wedgefield, LLC converted into a Florida corporation and became Pluris Wedgefield, Inc.  On or about June 18, 2015, Pluris Wedgefield, Inc. merged into an affiliate corporation organized under the laws of Florida called Pluris PCU, Inc.  Pluris PCU, Inc. changed its name to Pluris Wedgefield, Inc. on or about June 18, 2015.  On or about December 31, 2018, Pluris Wedgefield, Inc. converted into a Florida limited liability company and became Pluris Wedgefield, LLC.  Defendant Pluris Wedgefield, LLC is presently listed as the entity holding certificates Nos. 404-W and 341-S, and providing potable water to the Wedgefield community.

14.    Defendants Pluris Wedgefield, LLC, Pluris Wedgefield, Inc., and Pluris Holdings, LLC and their predecessor entities are sometimes collectively referred to as "Pluris" and, as further described herein, each of these organizations (i) were so closely related that they must be considered the same organization; and/or (ii) were agents of one and other; and/or (iii) were alter-egos of one and other in that the same individuals controlled, operated and regulated each company in a manner that they had no existence independent of one and other.

## FACTUAL ALLEGATIONS

### History of Wedgefield

15.    Wedgefield is a community in Orange County, Florida, roughly 25 miles east of Downtown Orlando. It has a population of approximately 7,000 people.

16.     Wedgefield was developed in the 1960's, during the boom of the United States space program. Located between Orlando and Cape Canaveral, the community was originally called "Rocket City" (and later "Cape Orlando"), as the idea for the development was to provide housing for the expanding number of Kennedy Space Center Employees.  In the late-1980s the development became known as Wedgefield.

17.     Today, the community of Wedgefield includes a vibrant neighborhood, a number of businesses, a public golf course, nature trails, and the Wedgefield School, a K-8 school that is part of the Orange County Public School System.

18.     Like the residents of any modern city, the residents of Wedgefield are entitled to  a steady supply of safe and clean drinking water – something they are not currently receiving.

19.     The water system in Wedgefield is a community water system.  It draws from a groundwater supply from two wells which tap into the Floridian aquifer.  The Floridian aquifer is one of the world's largest and most important aquifers, as it supplies drinking water to nearly 10 million people throughout Florida and the Southeastern United States.

20.     Public water systems in the United States are usually non-profit entities managed by state or local governments.  Nearly 90% of the population in the United States is served by government managed water systems.

21.     Despite being in Orange County, Florida, the Wedgefield water system was never tied into the Orange County Utilities Water Division system.  Instead, the rights to provide water to the Wedgefield community have historically been owned and operated by "Investor Owned Utilities" or "IOUs" seeking a financial profit from their purchase and operation of the community water system.  The current owner of these rights is Pluris Wedgefield, LLC.

**Regulation of Public Water Systems**

22.     Regardless of whether a community water system is managed by government or private enterprise, the water supply must meet certain safety standards, and be free from harmful chemicals and contamination.

23.     The Federal Safe Drinking Water Act was established in 1974 to protect the quality of drinking water in the United States.  *See* 42 U.S.C. § 300(f) *et seq*.  The act authorizes the United States Environmental Protection Agency ("EPA") to establish minimum standards to protect tap water and requires all owners or operators of public water systems to comply with these standards in order to safeguard the health of those who depend on the water supply.

24.     While the EPA sets the drinking water quality standards, the Federal Government delegates primary responsibility for regulating public drinking water supplies and public water systems to the states. The Florida Department of Environmental Protection ("FDEP") regulates public water systems in the state of Florida.

25.     One major component of the drinking water safety standards put forth by the EPA is that certain contaminate levels must not exceed a certain threshold.  The maximum contaminate level ("MCL") is the maximum permissible concentration of a contaminant in treated water that is delivered to any user of a public water system.  *See* 40 C.F.R. § 141.64.  This is a fundamental requirement for operators of all public water systems because any contaminates which exceed the MCL's expose users to increased risk of harm to health and property.  Violations of EPA mandated MCLs are enforceable regulatory standards.

26.     While some contaminates of a water supply originate from the source of the water, such as environmental pollutants, some contaminates are created by the water treatment process.

These are called disinfection byproducts. The most common disinfection byproducts are trihalomethanes ("TTHM"), haloacetic acids ("HAA5"), and chlorite.

27.    The existence of high levels of disinfection byproducts is typically an indication that the system is not using the correct amounts or proportions of disinfecting chemicals and/or has failed to adequately filter out solids and/or organic material prior to the water being exposed to the disinfection process. In short, if tap water contains high levels of disinfection byproducts, it is not because there is a problem with the source of the water, but rather a problem with the water treatment process.

28.    Despite charging some of the highest prices for tap water in the state of Florida, Pluris continues to put their customers at risk by supplying drinking water that does not meet the minimum standards set forth by the EPA. Specifically, Pluris has served, and continues to serve, drinking water with elevated levels of TTHM, HAA5, and chlorite that exceed the MCLs set forth by the federal government.

### History of Pluris in the State of Florida

29.    Pluris Wedgefield, LLC and its subsidiaries and affiliates have a long history of providing low quality water at outrageous prices to Florida citizens.

30.    In 2009, Pluris Wedgefield, LLC, through its predecessor entities, purchased the water rights to serve two communities in Hillsborough County.

31.    Shortly thereafter, residents began complaining of substandard water. Pluris customers complained the water was too dangerous to drink, shower, cook, bathe or even wash their cars.

32.     By 2015, Hillsborough County was forced to institute eminent domain proceedings in order to acquire the operations of Pluris in Hillsborough County.

33.     At a public hearing held by the Hillsborough Board of County Commissioners, the commissioners stated that the situation was "horrifying" and that "it [was] outrageous what the Pluris customers were being subjected to."  Another commissioner referred to Pluris' rate increase petition process as a "shell game."  The commissioners concluded that the ultimate goal was to purchase the Pluris Hillsborough facility as quickly as possible so that the residents would "have access to quality, affordable, drinking water at comparable rates to that other county residents are paying."[2]

34.     In 2016, Hillsborough County purchased Pluris's facilities and water certificates for $14,100,000.00.  An outrageous windfall for Pluris and its shareholders that was borne entirely by the former customers of Pluris in Hillsborough County.

35.     Pluris is now applying this same business model to the residents of Wedgefield. Pluris is supplying water that is of such low quality that Orange County is exploring eminent domaine proceedings in order to protect the health and wellbeing of its citizens.  As noted below, Pluris purchased the Wedgefield utility system in 2009 for approximately $7.3 million dollars and the recent estimate by Orange County is that the acquisition process could cost as much as $25 million.  The injured residents of Wedgefield are expected to bear this extraordinary expense.

**History of Pluris and Problems with the Wedgefield Water System**

36.     In April 2009, Pluris Wedgefield, LLC, through its predecessor entity, purchased the water treatment facilities and certificate numbers 404-W and 341-S from Wedgefield Utilities, Inc.  Immediately upon consummating the acquisition and receiving approval of the Florida Public

---

[2] June 19, 2014 Hillsborough Board of County Commissioners Hearing, Pluris PCU, Inc. Application for Rate Increase,    available   at   https://webapps.hillsboroughcounty.org/htv/caption/scripts/ph140619.doc   (last   accessed October 19, 2020).

Services Commission, Pluris became authorized to supply potable water to the Wedgefield residential housing community.

37. At that time, Pluris provided water to approximately 1,569 customers. As of 2019 there were over 1,800 meters serviced by Pluris and approximately 7,000 individuals consuming Pluris tap water.

38. From 2009 through the present, Pluris Wedgefield, LLC, and/or its affiliate and predecessor entities, have continuously owned and operated the community water system in Wedgefield.

39. During this time period, customers have filed numerous complaints with Pluris, with the Florida Department of Environmental Protection ("FDEP"), and the Public Service Commission ("PSC"). Since 2009 no Florida water company has had a higher rate of customer complaints than Pluris and its affiliate companies. Despite the numerous complaints and safety violations, the FDEP and the PSC have not remedied the dangerous potable water situation in Wedgefield.

40. Dating back to at least 2012, residents of the Wedgefield community have experienced very low-quality water. It bleaches their clothes, it gives off a terrible odor, it is often brown, green or yellow in color; it destroys water pipes and kills grass. The vast majority of Wedgefield residents refuse to drink the water, forcing them to incur the significant cost of purchasing bottled water for everyday use. Others have installed costly whole-house water filtration and purifying systems, but even those are typically not adequate to fix the problems with Pluris' water. Many residents will not allow their pets to drink the water – and virtually no residents will allow their children to drink the water.

41.    In fact, in 2016 when Orange County built a new elementary school in Wedgefield it underwent the highly unusual step of installing its own water filtration system, chlorination building, and water pump on the school campus.  This precaution was necessary to protect the children of Wedgefield from health risks associated with Pluris' drinking water.

**Pluris Water Testing**

42.    Pluris is required by law to frequently and adequately test its water supply to ensure that the water is clean, safe, and any contaminates are below the federally mandated MCL. Interestingly, most of the self-reported water quality tests reported by Pluris to the Florida Public Service Commission purport to show contaminate levels which do not exceed the MCLs.  In fact, in many cases, the levels are so low they are below detection.  Similarly, if Pluris is made aware of an upcoming water test by a third party, the results generally appear to be within the mandated MCL contaminate levels.

43.    For example, in late 2015, a Wedgefield resident, deeply concerned about the quality of the water, contacted the Central Florida Manager for the FDEP to see if they could come test her water.  She sent him several pictures, including this picture of cloudy yellow brown Pluris tap water filling a bathtub that was being prepared for an infant's bath time.



44.     The FDEP manager agreed to test her water, and contacted the Pluris Regional Manager, Joseph Kuhns, to set up a mutually agreeable time to test the water the following week. The night before the test was to occur, Pluris flushed its entire system and issued a boil water notice since it would be expected that the water after a significant systemic flush would have low levels of disinfectants.  The next day the FDEP representative tested the water in the presence of the Pluris manager, and noted that the water appeared normal, other than a very low level of the disinfectant chlorine (0.07 mg/L, which is significantly lower than the mandatory minimum level of 0.20 mg/L). This would be expected after a significant system flush, but did not address the resident's concerns about the typical state of her water.

45.     This was not a one-time event.  Residents regularly complain that Pluris flushes its lines prior to testing its water – a process that removes high levels of byproduct disinfectants from a water supply.  However, this manipulation tactic gives an inaccurate picture of the true water quality that is being served and consumed by the Wedgefield residents.

46.     Moreover, a former employee of Tri-Tech Laboratories – a company that was contracted to facilitate testing of the Pluris water supply over a several year period, notified the Florida Public Service Commission in 2018 that Pluris was intentionally manipulating its test results to put them in-line with federally mandated MCL requirements.

47.     Indeed, on the occasions where a third-party independently tests Defendants' water supply without warning, the contaminate levels consistently exceed the federally mandated MCLs. In many cases, these tests can be compared to Pluris' self-reported tests from days or weeks prior to demonstrate a statistically improbable variation.  In other circumstances, the independent third-party is incapable of duplicating Pluris' extraordinarily low numbers.

48.    In April 2016, after extensive discussions about the homeowners' concerns about the safety of their water, Orange County agreed to come out and test the Pluris water at several different locations throughout the neighborhood. Orange County tested 10 samples. All 10 of the samples drastically exceeded the MCL for TTHM.  The EPA reports that potential health effects from long-term exposure to TTHM above the MCL include liver, kidney and central nervous system problems, and increased risk of cancer.  The MCL for TTHM is 80 µg/L. The samples tested as follows (in µg/L: 116, 96, 155, 126, 105, 164, 199, 109, 152, 145).

49.    In addition, 2 of the samples exceeded the MCL for HAA5, another disinfection byproduct.  The EPA reports that potential health effects from long-term exposure to HAA5 above the MCL include the increased risk of cancer.  The MCL for HAA5 is 60 µg/L.   The two samples over the limit demonstrated HAA5 levels of 63.76 µg/L and 60.59 µg/L.

50.    As a result of these tests, it was determined that Pluris was maintaining an inadequate water system, and was required by the FDEP to make significant changes. Accordingly, in 2017, Pluris initiated a pilot study aimed to improve its water quality with ClO2 as the primary disinfectant. The high cost of implementing this program was passed through to the Wedgefield residents.

51.    After initiation of this program, Pluris reported that it was in compliance with MCL restrictions for disinfection byproducts and contaminates.  However, just as before, when a third-party tested the water, Pluris was found to be out of compliance with disinfection byproduct MCLs. In April 2018, Test America performed a water quality analysis at five locations throughout Wedgefield.  All 5 of the samples showed that Pluris' water drastically exceeded the MCL for chlorite. The MCL for chlorite is 1.0 mg/L. The five samples tested as follows (in mg/L): of 1.3, 1.3, 1.4, 1.4, and 1.2.

52.     Ingestion of water with elevated levels of chlorite has been shown to adversely impact red blood cells. Even short-term exposure results in a dose-dependent increase in methemoglobinemia (a condition affecting red blood cells' ability to bind oxygen) and anemia (the reduction in the number of red blood cells).[3]

53.     The EPA reports that long-term exposure to chlorite above the MCL is associated with anemia in all populations, and nervous system effects in infants and young children.

54.     In October 2019 and June 2020, third-party companies again performed nonscheduled water quality tests at homes in Wedgefield.  In both instances, Pluris was found to be out of compliance with disinfection byproduct MCLs.

**Pluris Price Increases and Orange County Attempts to Purchase the Water System**

55.     Despite being exposed to very low-quality water, Pluris customers pay the highest rates in Orange County and some of the highest rates for water in the State of Florida.  For 5,000 gallons of potable water, a Pluris customer would pay around $76, nearly 6 times more than the $13.65 an Orange County Utilities customer would pay.  Pluris customers frequently pay between $150 - $250 in a month for potable and wastewater services from Pluris.

56.     Pluris has consistently increased the price of their water, despite not investing an amount commensurate with the increased rates back into the water system to alleviate the problems Pluris customers have been exposed to.

57.     Numerous Pluris residents and others, including Orange County Commissioner Ted Edwards and Emily Bonilla, have vigorously opposed, to no avail, the rate increases due to the consistently poor water quality of Pluris' water system, the increasingly high cost of the water, poor customer service and failure to reinvest adequate money into the Wedgefield water system.

---

[3] https://www.who.int/water_sanitation_health/dwq/chemicals/chlorateandchlorite0505.pdf

58.     Starting in 2016, Wedgefield residents have made every attempt to get Orange County to take over treatment of their water system from Pluris. Wedgefield residents overwhelmingly back the plan. Orange County has even hired a consulting firm to value the takeover, which could cost nearly $25 million. The high purchase cost would be defrayed among Wedgefield residents. These extreme measures should not be necessary for a Central Florida Community to have access to clean running water, but the residents of Wedgefield have reached a point of desperation.

59.     Thousands of Wedgefield residents are stuck, and have been stuck for years, with no other option for their water system.  Residents are stuck either paying exorbitantly high prices for water that they have to run through expensive filtration devices just to be able to use, or buy exclusively bottled water and install wells at their homes for non-consumption use.  This issue has become widely publicized, and property values have been affected as a result of Pluris' inability to comply with the basic requirements of operating a community water system.  Meanwhile, Pluris, and specifically, Pluris Holdings, LLC, continues to reap extraordinary financial gains from the dysfunctional water service in Wedgefield.

**CLASS REPRESENTATATION ALLEGATIONS**

60.     Plaintiffs incorporate all prior paragraphs as if restated herein.

61.     This action on behalf of Representative Plaintiffs and all others similarly situated has been brought and may be properly maintained pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure.

62.     Representative Plaintiffs and Members of the proposed Class are residents of Florida who have been damaged through contamination of their drinking water and residential properties.

63.     The Class proposed by the Representative Plaintiffs and those they represent is as

follows:

> **All persons in the Wedgefield residential housing community whose property received potable water supplied by the Pluris Wedgefield distribution system anytime from April 25, 2015 through the date of class certification.**

> **Subclass A (Residential Property Owners and Occupants – Contract Damage)**

> **All persons in the Wedgefield residential housing community who contracted with Pluris to receive potable water supplied by the Pluris Wedgefield water distribution system anytime from April 25, 2015 through the date of class certification.**

> **Subclass B (Residential Property Owners - Property Damage)**

> **All owners of residential property in the Wedgefield residential housing community whose property received potable water supplied by the Pluris Wedgefield water distribution from April 25, 2015 through the date of class certification.**

64.    Excluded from the Class are:

a)    Employees of Defendants and any entities in which Defendants have a controlling interest;

b)    Any of the legal representatives, heirs, successors, or assigns of Defendants;

c)    The Judge to whom this case is assigned and any Member of the Judge's immediate family and any other judicial officer assigned to this case;

d)    All persons or entities that properly execute and timely file a request for exclusion from the Class;

e)    Any attorneys representing the Representative Plaintiffs or Members of the proposed Class.

65.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

66.    Numerosity: The Members of the Class are so numerous that separate joinder of each

16

Member is impractical, within the meaning of Rule 23(a)(1). Although the exact number of Class Members will be better established after Class notification, upon information and belief, the number of Members in the Class exceeds 5,000 people. Putative Class Members are readily identifiable through records of the Water Utilities and through property records and may be given any required notices by regular mail, supplemented, if necessary and required by the Court, by published notice.

67.     Common Questions of Law and Fact: There are numerous questions of law and fact common to the Class, as required by Rule 23(a)(2), including:

a)      The factual history of the use, development, and distribution of potable water through the Pluris Wedgefield water system;

b)      Whether the water supplied to Representative Plaintiffs and Class Members has been and continues to be contaminated with disinfectant byproducts;

c)      The extent of the contamination of Representative Plaintiffs and Class Members potable water supply;

d)      When the Defendants knew of the effects of TTHMs, Chlorite and related chemical disinfectant byproducts;

e)      When the Defendants knew of the contamination of Representative Plaintiffs and Class Members potable water supply;

f)      Whether the Defendants failed to disclose the harmful effects of these disinfectant byproducts and there existence in Defendants potable water supply;

g)      Whether the Defendants' conduct constitutes negligence, gross negligence, wantonness, breach of contract, battery, nuisance, and trespass;

h)      Whether the Plaintiffs and proposed class have been damaged in their property

and suffered a loss of value of property due to the Defendants' conduct;

    i)    The necessary remedial actions to remove Defendants' disinfectant byproducts from the Representative Plaintiffs' and Class Members' water supplies and property; and

    j)    The health risks associated with Representative Plaintiff and Class Members exposure to the contaminants at issue;

    k)    The appropriateness of equitable and/or injunctive relief to prevent Defendants' chemicals from invading the Representative Plaintiffs' and Class Members' water supplies and properties and protect Representative Plaintiffs' and Class Members' from future harm.

    68.    The questions of law and fact common to Members of the Class predominate over any questions affecting only individual Members, and thus a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

    69.    Typicality: The claims of the Representative Plaintiffs are typical of the claims to be advanced by Members of the Class, and their claims encompass those of the other Class Members they seek to represent, as required by Rule 23(a)(3). The claims are typical because the facts and circumstances giving rise to liability are the same, the claims are based on the same legal theories, and the damages suffered by the Representative Plaintiffs are the same kinds of damages suffered by the Members of the Class.

    70.    Adequacy of Representation: The Representative Plaintiffs can fairly and adequately protect and represent the interests of each Member of the Class as required by Rule 23(a)(4). The Representative Plaintiffs will fairly and adequately protect and represent the interests of the Members of the Class based on the following facts and circumstances: their interests do not conflict; their interests are co-extensive with common rights of recovery based on the same essential facts and legal theories; they are Members of the same communities; they are

similarly damaged and are seeking the same remedies; and they intend to prosecute this action vigorously. Plaintiffs have retained counsel competent and experienced in complex class action and toxic tort litigation.

71.    The prosecution of separate actions by individual Members of the Class would create a risk of (i) inconsistent or varying adjudications with respect to individual Members of the Class which would establish incompatible standards of conduct for the Defendants and/or (ii) adjudications with respect to individual Members of the Class which would as a practical matter be dispositive of the Members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

72.    The Defendants have acted and/or refused to act on grounds generally applicable to all Members of the proposed Class, making final declaratory and injunctive relief concerning the Class as a whole appropriate within the meaning of Rule 23(b)(2).

73.    Common questions of fact and law among the Representative Plaintiffs and Members of the Class predominate over questions affecting only individual Class Members, within the meaning of Rule 23(b)(3). Some of the common issues are set forth in Paragraph 67 above.

74.    Additionally, Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy. Certification under Rule 23(b)(3) would be proper in that, among other things: there is no interest by Members of the Class in individually controlling the prosecution of separate actions; the expense of prosecuting individual claims for the matters for which Class certification is sought would be prohibitive in light of the typical claimant's injuries; neither the Plaintiffs nor Members of the proposed Class have filed or are parties to any litigation in which the legal and factual issues raised herein are to be adjudicated; and it is desirable to concentrate the litigation of claims in a single proceeding so as to avoid unnecessary

and expensive duplication of actions and to provide for judicial economy. Whatever difficulties may exist in the management of a Class action will be greatly outweighed by its benefits.

75.    Class action treatment is preferable to other available methods in providing a fair and efficient method for the adjudication of the controversy described herein, which has affected a large number of persons. The Class action provides an effective method whereby the enforcement of the rights of the Plaintiffs can be fairly managed without unnecessary expense or duplication.

## COUNT ONE – NEGLIGENCE
## (ALL CLASS MEMBERS)

76.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 75 above as if fully restated herein.

77.    Defendants owe and owed a duty to Representative Plaintiffs and members of the Proposed Class to exercise due and reasonable care in their treatment and service of potable water to prevent the discharge of toxic chemicals exceeding federal MCL guidelines, including TTHM, HAA5, chlorite and related chemicals.

78.    Defendants breached these duties owed to Plaintiffs, and under the circumstances, Defendants' breaches constitute negligent, willful and/or reckless conduct.

79.    As a direct, proximate and foreseeable result of Defendants' conduct, practices, actions, and inactions, Representative Plaintiffs and Members of the proposed Class who are owners and occupants of residential real property have been caused to suffer, and will continue to suffer, (a) ingestion of toxic and contaminated potable water; (b) losses for the purchase of water filters and/or bottled water, and other damages arising from the contamination of the Wedgefield drinking water, (c) damage to their interests in real property, including diminution in value and/or loss of rental value, (d) the need for mitigation and remediation of Defendants' contamination, (e) annoyance, inconvenience and interference and loss of use and enjoyment of their property, and

(f) battery and continuing trespass.

80.    As a direct, proximate and foreseeable result of Defendants' conduct, practices, actions, and inactions, Representative Plaintiffs and Members of the proposed Class have been caused to suffer, and will continue to suffer, damage from their exposure to Defendants' harmful disinfectant byproducts and other chemicals in the form of the cost of diagnostic testing to determine the harm from their exposure. In addition to those economic losses, the Representative Plaintiffs and members of the Proposed Class claim damages for mental anguish based on the willful and/or reckless conduct of the Defendants.

81.    Therefore, the Representative Plaintiffs and members of the proposed Class claim money damages in an amount that will fairly and reasonably compensate them for the harm caused by the Defendants.

## COUNT TWO – GROSS NEGLIGENCE
### (ALL CLASS MEMBERS)

82.    Plaintiffs incorporate by reference the allegations set forth in paragraph 1 through 75 above as if fully restated herein.

83.    Defendants owe a duty to Representative Plaintiffs and proposed Class members to exercise due and reasonable care in their treatment and service of Wedgefield's potable water to insure and prevent the discharge of chemicals, including TTHM, HAA5 and chlorite that are beyond the federally mandated levels into the water supply and onto the property of Plaintiffs.

84.    In breaching the duties and performing the other tortious acts and inaction described above, Defendants acted in a wanton, willful, and reckless manner.

85.    Defendants knew or should have known the danger to Representative Plaintiffs and members of the proposed Class created by Defendants' conduct, practices, actions, and inactions.

86.    Defendants knew or should have known of the likely impact, harm, damage, and injury their conduct would have on Representative Plaintiffs and members of the proposed Class.

87.    Defendants' conduct, practices, and inactions evidence Defendants' reckless disregard for Plaintiffs' property and the health of Representative Plaintiffs and Members of the proposed Class.  Defendants violations were so reckless and wanting in care that they constitute a conscious disregard or indifference to the life, safety and rights of the Wedgefield community.

88.    In addition to compensatory damages, Defendants should also be liable for punitive damages as a result of Defendants' wantonness in an amount determined by the character and degree of Defendants' wrongful conduct, and the necessity to prevent the same or similar wrongful conduct by the Defendants and others in the future.

## COUNT THREE – BREACH OF CONTRACT
### (SUBCLASS A)

89.    Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 75 above as if fully restated herein.

90.    Representative Plaintiffs and Members of the proposed Class are owners or occupants of property served by Pluris.

91.    Representative Plaintiffs and Members of proposed Subclass A contracted with Pluris to receive potable water.  A copy of the standard application for new service and contractual agreement between Representative Plaintiffs and Members of proposed Subclass A is attached hereto as **Exhibit A**.

92.    Representative Plaintiffs and Members of proposed Subclass A performed all of their obligations under the applicable contract, except those waived, excused or prevented by the actions or inactions of Defendants.

93.    Defendants breached the contract by failing to furnish potable water that was fit for its intended use and met the water quality standards set forth by the EPA and FDEP.

94.    As a direct, proximate and foreseeable result of Defendants' conduct, practices, actions, and inactions, Representative Plaintiffs and Members of proposed Subclass A have been caused to suffer, and will continue to suffer, (a) losses from failing to receive water of the quality they contracted to receive, (b) losses for the purchase of water filters and/or bottled water, (c) damage to their interests in real property, including diminution in value and/or loss of rental value, (d) the need for mitigation and remediation of Defendants' contamination, and (e) costs and damages associated with the need for Orange County to take over the water treatment process.

95.    In the alternative, the Representative Plaintiffs and Members of proposed Subcalss A seek specific performance of the contract.  Specific performance is warranted because Representative Plaintiffs and Members of the proposed Class cannot be adequately compensated by a purely monetary award.

96.    Therefore, the Representative Plaintiffs and members of the proposed Subclass A claim money damages in an amount that will fairly and reasonably compensate them for the harm caused by Defendants breach of contract.  Alternatively, Representative Plaintiffs prey for a decree of specific performance requiring Defendants to provide potable water to the Wedgefield community in accordance with the terms of their agreement.

### COUNT FOUR – NUISANCE
### (ALL CLASS MEMBERS)

97.    Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 through 75 above as if set forth fully herein.

98.    Representative Plaintiffs and Members of the proposed Class are owners or occupants of property served by Pluris.

99.    In Florida, a nuisance is any annoyance to the community or harm to public health.

100.    Defendants have created a nuisance by their discharge of toxic chemicals into the Wedgefield water supply.

101.    The high levels of chemical disinfectant byproducts found in the Wedgefield water supply, have created a condition that threatens the health and well-being of Representative Plaintiffs and Members of the proposed Class.  The high levels of chemical disinfectant byproducts found in the Wedgefield water supply have further created a condition that damages the personal property of Representative Plaintiffs and Members of the proposed Class.

102.    It was reasonably foreseeable, and in fact known to the Defendants, that their actions would cause interference with the property rights of Representative Plaintiffs and Members of the proposed Class, and cause an increased risk of physical harm.  The nuisance has caused, and will continue to cause, mental anguish to Representative Plaintiffs and Members of the proposed Class until it is satisfactorily abated.

103.    The Representative Plaintiffs and Members of the proposed Class have suffered special damages from Defendants' discharge of chemicals into the Wedgefield water supply because Representative Plaintiffs and Members of the proposed Class consume and have consumed the contaminated drinking water, and the contaminated water has invaded their residences, and continues to invade them, altering and damaging their property.  These damages are different in kind and degree from the damages suffered by the public in general.

104.    The Defendants' nuisance is continuing, because Defendants continue to release chemicals into the water supply in amounts that exceed the MCLs set forth by the EPA.

105.    Therefore, the Representative Plaintiffs and members of the proposed Class claim money damages in an amount that will fairly and reasonably compensate them for the harm caused

by the Defendants, including for (a) losses for the purchase of water filters and/or bottled water, (b) damage to their interests in real property, including diminution in value and/or loss of rental value, (c) the need for mitigation and remediation of Defendants' contamination, (d) annoyance, inconvenience and interference and loss of use and enjoyment of their property, and (e) costs and damages associated with the need for Orange County to take over the water treatment process. In addition, the Plaintiffs claim damages for mental anguish in an amount to be determined by the jury that are fair and reasonable in consideration of the nature, severity, and length of time of the nuisance caused by the Defendants.

**COUNT FIVE – ABATEMENT OF NUISANCE**
**(ALL CLASS MEMBERS)**

106.    Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 through 75 above as if fully restated herein.

107.    The high levels of chemical disinfectant byproducts found in the Wedgefield water supply, have created a condition that threatens the health and well-being of the Representative Plaintiffs and members of the proposed Class, and Plaintiffs' ingestion of TTHM, HAA5, chlorite and related chemicals in excess to the EPAs MCLs, causes physical harm to Representative Plaintiffs and Members of the proposed Class. Representative Plaintiffs and Members of the proposed Class have further suffered harm to their personal property.

108.    Plaintiffs have the right to bring an action to abate the nuisance caused by Defendants', which has caused and continues to cause contamination of the Wedgefield water supply, because their injury is different in kind and degree from the injury suffered by the public at large.

109.    In addition to their claims for damages, Plaintiffs are entitled to an injunction to abate the nuisance created and maintained by Defendants. The Court should issue an injunction

requiring Defendants to comply with federal MCL guidelines for disinfection byproducts in the Wedgefield potable water supply and prevent these chemicals and toxins from continuing to contaminate Plaintiffs' water and properties. Plaintiffs continued to suffer irreparable injury caused by Defendants' continuing nuisance for which there is no adequate remedy at law.

## COUNT SIX – BATTERY
### (All CLASS MEMBERS)

110.    Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 through 75 above as if fully restated herein.

111.    The Defendants touched or contacted the Representative Plaintiffs and Members of the proposed Class through their release of toxic chemicals into Plaintiffs' water supply, which Representative Plaintiffs and Members of the proposed Class ingested.

112.    The toxic chemicals were harmful and ingested by Representative Plaintiffs and Members of the proposed Class without their knowledge or consent.

113.    The Defendants knew or should have known that their intentional release of toxic chemicals into Plaintiffs' water supply were substantially certain to touch or contact Representative Plaintiffs and Members of the proposed Class. This touching or contact of the Representative Plaintiffs and Members of the proposed Class was and is harmful and offensive.

114.    The Defendants' battery is continuing, because Defendants continue to discharge and release toxic chemicals into Plaintiffs' water supply that exceed federally mandated MCLs.

115.    As a result of the Defendants' battery, Representative Plaintiffs and Members of the proposed Class have been and continue to be damaged.

116.    Therefore, Representative Plaintiffs and Members of the proposed Class claim money damages in an amount that will fairly and reasonably compensate them for the economic harm caused by Defendants' battery. In addition, Representative Plaintiffs and Members of the

proposed Class claim damages for mental anguish in an amount to be determined by the jury that are fair and reasonable in consideration of the nature, severity and length of time of the battery caused by the Defendants.

## COUNT SEVEN – TRESPASS
## (SUBCLASS B – PROPERTY OWNERS)

117.    Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 through 75 above as if fully restated herein.

118.    Defendants' discharged toxic chemicals into the water supply and onto the properties of Representative Plaintiffs and Members of proposed Subclass B without their permission, constituting an invasion by foreign substance.  These acts by the Defendants were intentional, and the Defendants knew or should have known that the acts would produce the trespass, *i.e.*, the invasion by foreign substance.

119.    Defendants' have physically intruded onto the property of Representative Plaintiffs and Members of proposed Subclass B and have physically altered Representative Plaintiffs and Members of proposed Subclass B's properties.  This physical alteration has caused substantial damage to the property of Representative Plaintiffs and Members of proposed Subclass B.

120.    Defendants were not authorized to and/or exceeded the scope of their authority by delivering water to Representative Plaintiffs and Members of the proposed Class that included toxic chemicals.

121.    As a direct, proximate and foreseeable result of Defendants' conduct, practices, actions, and inactions causing a trespass, Representative Plaintiffs and Members of proposed Subclass B who are owners of residential real property have been caused to suffer, and will continue to suffer, damage to their interests in real property including, (a) losses for the purchase of water filters and/or bottled water, (b) damage to their interests in real property, including

diminution in value and/or loss of rental value, (c) the need for mitigation and remediation of Defendants' contamination, and (d) annoyance, inconvenience and interference and loss of use and enjoyment of their property.

**COUNT EIGHT – VIOLATION OF FLORIDA DECEPTIVE
AND UNFAIR TRADE PRACTICES ACT
(ALL CLASS MEMBERS)**

122.    Plaintiffs incorporate herein by reference the allegations set forth in paragraphs 1 through 75 above as if fully restated herein.

123.    The Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. ("FDUTPA") prohibits "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).

124.    Representative Plaintiffs and Members of the proposed Class are a "consumer" and "[i]nterested party or person within the meaning of Fla. Stat. § 501.203(6) and a "person" as envisioned in Fla. Stat. § 501.211.

125.    Defendants engaged in "[t]rade or commerce" within the meaning of Fla. Stat. § 501.203(8), during the relevant time periods, as detailed further herein.

126.    During the relevant periods and as detailed further herein, Defendants have engaged in unconscionable, unfair and/or deceptive acts or practices in commerce in violation of the FDUTPA by actively promoting and marketing the water supplied to the Wedgefield housing community as safe for consumption and in compliance with all state and federal regulations.  In reality, Defendants knew that the water was not safe for consumption and was not in compliance with state and federal regulations in that the water contained disinfectant byproducts which exceeded the MCLs set forth by the federal government.

127.    For example, in their Annual Drinking Water Quality Reports, which Pluris

provides to its customers, Pluris represented that its TTHM numbers for the years 2014 and 2015 were as follows: 2.30-2.31µg/L (2014); and 1.13 – 2.73µg/L (2015). In 2016 when Orange County tested the water, the average test sample for TTHM was 136.7µg/L – well above the MCL for TTHM. Even after that alarming result, in their 2016 Annual Drinking Water Quality Report Pluris represented to its customers that its system *did not* incur an MCL violation for TTHM.

128.    Defendants' unconscionable, unfair or deceptive acts or practices in violation of the FDUTPA offend Florida's public policy, are immoral, unethical, oppressive and unscrupulous, as well as malicious, wanton and manifesting of ill will, and they caused substantial injury to Representative Plaintiffs and the proposed Class. Representative Plaintiffs and Members of the proposed Class risk irreparable injury as a result of Defendants' acts, misrepresentations and omissions in violation of the FDUTPA, and these violations present a continuing risk to Representative Plaintiffs and Members of the proposed Class.

129.    Defendants' acts and practices in violation of the FDUTPA offend Florida public policy, are immoral, unethical, oppressive or unscrupulous, as well as malicious, wanton and manifesting ill will; caused and continue to cause substantial injury to Representative Plaintiffs and Members of the proposed Class; and put Representative Plaintiffs and Members of the proposed Class at increased risk of future harm.

130.    As a direct and proximate result of all Defendants' violations of the FDUTPA, Representative Plaintiffs and Members of the proposed Class suffered and continue to suffer losses constituting injury-in-fact. Representative Plaintiffs and Members of the proposed Class are entitled, and do hereby seek, to recover its actual damages under Fla. Stat. § 501.211(2) and their attorneys' fees and costs under Fla. Stat. § 501.2105(1).

131.    Representative Plaintiffs and Members of the proposed Class have been seriously

aggrieved by all Defendants' violations of the FDUTPA and are therefore entitled to, hereby, seek an order under Fla. Stat. § 501.211(1) declaring all Defendants' acts and practices unlawful under and in violation of the FDUTPA and enjoining all Defendants' unfair, unconscionable, and/or deceptive acts or practices, and awarding attorneys' fees, costs and any other just and proper relief available under the FDUTPA.

**COUNT NINE – MEDICAL MONITORING**
**(ALL CLASS MEMBERS)**

132.     Representative Plaintiffs and Members of the Proposed Class incorporate by reference the allegations set forth in paragraphs 1 through 75 as if fully set forth herein.

133.     Representative Plaintiffs and Members of the Proposed Class seek equitable relief in the form of a Court-established and Court-supervised medical monitoring program solely for the purposes of diagnosing diseases and sharing information with Representative Plaintiffs and Members of the Proposed Class, the establishment of a medical monitoring fund, and further request Injunctive relief compelling Defendants to finance the medical monitoring program. Representative Plaintiffs and Members of the Proposed Class specifically request Court supervision and participation in the medical monitoring program.

134.     Upon information and belief, as a direct and proximate result of Defendants' wrongful conduct as set forth above, Representative Plaintiffs and Members of the Proposed Class seek have been exposed to hazardous substances, and thereby suffer, and will continue to suffer, a significantly increased risk of serious injury and diseases as compared to the general public. This increased risk makes periodic diagnostic medical testing and examinations necessary. Such medical procedures are different from those normally recommended in the absence of the aforementioned exposure to the hazardous substances at issue here.

135.     Medical monitoring will reduce the risk of illness by using medical tests to detect

disease caused by Representative Plaintiffs and Members of the Proposed Class' exposure to hazardous substances. Medical monitoring and testing procedures, including clinical examinations, exist which make early detection of exposure to these hazardous substances, and early detection of resulting disease, feasible and beneficial.

136.    The increased susceptibility to injuries and irreparable threat to the health of Representative Plaintiffs and Members of the Proposed Class resulting from their exposure to hazardous substances can be appropriately mitigated and addressed only by the creation of a comprehensive, Court-established medical monitoring program supervised by the Court, and funded by Defendants, that:

i.    Provides periodic medical testing and examinations designed to facilitate early detection of adverse effects related to exposure to hazardous substances; and

ii.    Gathers and forwards to treating physicians information related to the diagnosis and treatment of injuries and diseases which may result from exposure to hazardous substances produced by Defendants' contaminated potable water.

137.    Establishment of a Court-supervised medical monitoring regimen can readily assure that the proceeds of any monitoring trust fund are reserved for the provision of and/or reimbursement for, the above-referenced activities, and those needed examinations and testing procedures the Representative Plaintiffs and Members of the Proposed Class actually undergo, guaranteeing the purely equitable use of any trust funds. The Court's use of its injunctive powers to oversee and direct medical monitoring in this case is an appropriate and necessary method of adjudication.

138.    The precise nature, form, extent and duration of Court-ordered diagnostic monitoring, clinical examinations, research activities and education programs are a matter for the

Court to decide, after hearing and consultation with medical, industrial, and other experts, and adjudication that the right to this relief is appropriate and necessary.

139.    The medical monitoring program should be generally supervised by the Court and may be directly managed by Court appointed and supervised special masters or trustees.

140.    The program should involve the monitoring of Representative Plaintiffs and Members of the Proposed Class by designated physicians approved by the Court.

141.    The program could also involve the collection of medical data utilized for group studies and diagnostic testing. The program should be designed to share this data with Representative Plaintiffs and Members of the Proposed Class and their treating physicians.

142.    During program administration, Defendants should address issues implicated by program administration as they develop.

## COUNT TEN – INJUNCTIVE RELIEF
### (ALL CLASS MEMBERS)

143.    Representative Plaintiffs and Members of the Proposed Class incorporate herein by reference the allegations set forth in paragraphs 1 through 75 above as if fully set forth herein.

144.    Upon information and belief, Defendants' potable water supply is and will continue to be contaminated with chemical disinfectant byproducts that exceed the MCLs established by federal law.

145.    This anticipated future contamination will continue to damage Representative Plaintiffs and Members of the proposed Class, as alleged herein.

146.    Defendants will be responsible for this anticipated future contamination and related damage, as they have been in the past.

147.    Representative Plaintiffs and Members of the proposed Class are without adequate

remedy at law, making injunctive and other equitable relief appropriate.

148.    Representative Plaintiffs and Members of the proposed Class will suffer irreparable harm if the Court does not grant the injunctive and equitable relief requested.

149.    Accordingly, all future contamination within the Wedgefield community should be enjoined.

## CLAIM FOR RELIEF

WHEREFORE, Individual and Representative Plaintiffs and Members of the proposed Class respectfully request this Court to grant the following relief:

a)    Award Representative Plaintiffs and Members of the proposed Class compensatory damages to the utmost extent allowed by law sufficient to compensate them for damage from wantonness, negligence, trespass, and nuisance, and including but not limited to diminution in value of real property and/or loss of rental value, the cost of mitigation or remediation of Defendants' contamination, annoyance and interference, loss of use and enjoyment of real property, aggravation and inconvenience, and mental anguish;

b)    Award Representative Plaintiffs and Members of the proposed Class compensatory and consequential damages to the utmost extent allowed by law sufficient to compensate them for Defendants breach of contract to supply Plaintiffs with potable water that was fit for its ordinary use and met the minimum requirements set forth by the EPA and FDEP;

c)    Award Representative Plaintiffs and Members of the proposed Class compensatory damages to the utmost extent allowed by law sufficient to compensate them for battery and reasonably ascertainable future expenditures including reasonably necessary diagnostic testing;

d)    Award Representative Plaintiffs and Members of the proposed Class punitive

damages to the utmost extent allowed by law;

e) Issue an injunction requiring Defendants to remove their chemicals and toxins from the water supplies of Plaintiffs and to prevent these chemicals and toxins from continuing to contaminate Plaintiffs' water supplies, based on the continuing irreparable injury to Plaintiffs posed by the continuing nuisance and damage to Plaintiffs' property interests, for which there is no adequate remedy at law;

f) Award attorney fees and costs and expenses incurred in connection with the litigation of this matter;

g) Certify this case as a Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure; and

h) Award such other and further relief as this Court may deem just, proper, and equitable.

## JURY TRIAL DEMAND

Plaintiffs demand a trial of this action by jury.

Dated: October 19, 2020

/s/ Matthew S. Mokwa
Steven R. Maher, Esq. (FL# 887846)
Matthew S. Mokwa, Esq. (FL# 47761)
Jason R. Fraxedas, Esq. (FL # 63887)
**THE MAHER LAW FIRM, P.A.**
271 W. Canton Ave.. Suite 1
Winter Park, FL 32789
Phone:  (407) 839-0866
Fax:  (407) 425-7958
smaher@maherlawfirm.com
mmokwa@maherlawfirm.com
jrfraxedas@maherlawfirm.com

AND

Christopher B. Hood, Esq.
AL Bar No. 2280-S35H
**HENINGER GARRISON DAVIS, LLC**
2224 First Avenue North
Birmingham, AL  35203
Phone:  205.326.3336
chood@hgdlawfirm.com

***Counsel for Plaintiffs***